JUDGE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ROBERT J. HOWELL JR.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. CR21-190-JCC

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY

Note on Motion Calendar:
Sept. 27, 2024 (Dkt. 69)

Robert Howell, through Assistant Federal Public Defenders Gregory Geist and Mukund Rathi, files a combined pretrial motion. He moves to dismiss the indictment, suppress all evidence of unlawful searches, and obtain a *Franks* hearing. Mr. Howell moves to compel discovery as it relates to each of his above listed motions. Additionally, he requests an evidentiary hearing and oral argument.

## I.   INTRODUCTION AND FACTUAL BACKGROUND[1]

These motions are based on outrageous government conduct and collusion between the U.S. and foreign governments, as well as U.S. law enforcement's admissions that it conducted two warrantless searches to mislead a magistrate judge into affirming probable cause to issue not just one, but two search warrants.

The government charged Mr. Howell with possession of child pornography (Dkt. 1, 17) after it engaged with a Foreign Law Enforcement Agency (FLA) to unlawfully

---

[1] If the government disputes any of the following factual allegations, it should specifically dispute those facts in its response. The Court should treat as admitted any facts the government fails to dispute.

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

search his alleged devices. In 2019, after seizing a website distributing child sexual abuse material (CSAM), the FLA identified an IP address, later connected to Mr. Howell's physical address. Ex. 1 (FLA Tip) (filed under seal). The FLA operated this website, and distributed CSAM to an unknown number of people, for months. It also used the website to distribute malware, similar to the U.S. government's "network investigative technique" (NIT) from the "Playpen" cases several years ago. The Court should dismiss the indictment because of the government's knowing reliance and collusion in this outrageous conduct.

The government knew that it could not obtain a lawful search warrant with just the FLA "tip." Instead, the government performed several warrantless and unlawful searches, and then used those fruits to obtain two search warrants. Ex. 2 (First Search Warrant) (filed under seal); Ex. 3 (Second Search Warrant) (filed under seal). The first warrant granted the government permission to search four image files related to a 2013 Google CyberTip. The government knew about the Google CyberTip since at least July 2013, and it was unrelated to the FLA investigation. But, prior to filing for the first warrant, SA Kimmel viewed the four images without a warrant in violation of the Fourth Amendment. Ex. 2 at 12 ("Although I have already examined the SUBJECT FILES, I am seeking a warrant authorizing me to open and examine the SUBJECT FILES…."). Additionally, SA Kimmel's affidavit for the first warrant admitted that another law enforcement agent, Oregon Special Agent McBeth, viewed four other images without a warrant that were tied to a separate Microsoft CyberTip that the government knew about since at least July 2012. Ex. 2 at 7 ("According to police reports I obtained, Special Agent Page McBeth reviewed the files of suspected child pornography.").

After viewing the four images both before and after obtaining the first warrant, SA Kimmel applied for a second warrant to search Mr. Howell's residence and devices.

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

In the second warrant application, SA Kimmel repeats that both he and SA McBeth conducted warrantless searches of the respective images. Ex. 3 at 29 ("I reviewed…the files themselves. However, I was not able to determine whether an employee of Google reviewed these files before submitting them to NCMEC."); Ex. 3 at 28 ("According to police reports I obtained, Special Agent Page McBeth reviewed the files of suspected child pornography. I have not been able to determine whether these files were reviewed by an employee of Microsoft before they were submitted to NCMEC.").

As a result of the unlawful search of the home and devices, law enforcement discovered suspected child pornography that resulted in the instant charge. The Court should suppress this evidence because it was based on an outrageous and warrantless FLA search and the government's other warrantless and unlawful searches, which affected the magistrate's decisions to issue warrants in the first place.

## II.     THE COURT SHOULD DISMISS THE INDICTMENT.

### A.     This case is far more aggravated than the government's conduct in "Playpen."

Several years ago, courts addressed the government's investigation and operation of Playpen, "a website dedicated to sharing and distributing child pornography that operated" on Tor. *United States v. Vortman*, No. 16-CR-210, 2016 WL 7324987 at *1 (N.D. Cal. Dec. 16, 2016), *aff'd*, *Vortman II*, 801 F. App'x 470 (9th Cir. 2020). The government seized the website, but rather than "immediately shutting down the website permanently … the government sought a warrant allowing it to run Playpen from its server for thirty days and to deploy a network investigative technique ('NIT') against individuals who logged into Playpen using both a username and password." *Id.* at *2. The NIT was malware "that would cause the user's computer to transmit identifying information to a government computer." *Id.*

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Courts generally denied motions to dismiss for the outrageous government conduct of operating a CSAM website and motions to suppress warrants resulting from the NIT for lack of probable cause. *Id.* at *3-13; *United States v. Anzalone*, 923 F.3d 1, 3-6 (1st Cir. 2019). Those courts emphasized that Playpen's homepage featured "two images of partially clothed prepubescent females with their legs spread apart—a likely preview of the illicit content on the website;" that "to get beyond the homepage, users would need to register a new account, a process which explicitly advised users to provide a false email address in order to avoid detection;" and that target users "actively logged onto the website" for hours and accessed specific CSAM material. *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 3, 5 ("…its registration requirement, its focus on anonymity, and the image depicted on its homepage…"). The government operated Playpen for "less than two weeks." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 3.

Here, however, the Target Website's homepage was benign, there was no registration requirement, it did not encourage deception and anonymity, and the target user was only alleged to have accessed the homepage. The FLA operated the CSAM website, with the government's knowledge and involvement, for an unknown period of time that may have spanned five months or longer.

### B.     The government's conduct was outrageous.

The government's knowing reliance on the FLA's operation of a CSAM website was "so grossly shocking ... as to violate the universal sense of justice." *See United States v. Black*, 733 F.3d 294, 298 (9th Cir. 2013). The relevant factors are:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Id.* at 303.

Unlike the Playpen cases, the benign nature of the Target Website's homepage and the affidavit's allegation that the target user accessed the homepage do not justify the government's outrageous conduct.

### C.   Factors 1 and 2

As to the first factor, there was no "propensity the government knew about when it initiated its sting operation" and second, there was no "reason to suspect an individual or identifiable group." *See Black*, 733 F.3d at 304.

In the Playpen cases, "users had to input Playpen's address—random sequence of characters and all—into the Tor browser." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 5 (emphasizing "Playpen's hidden nature on the Tor Network"). Here, by contrast, the affidavit alleges that there are "directory sites" that "users utilize … to identify new web forums, chat sites, image galleries and file hosts." Ex. 3 at 25. The Target Website "was listed on one or more of such directory sites." *Id.* While the affidavit also alleges some users access directory sites to find CSAM, *id.*, it does not allege that is true about the target user. And while the affidavit alleges that the directory sites on which the Target Website appeared were "advertising hidden services dedicated to" CSAM, *id.*, it does not allege that the advertisements were transparent about that dedication. Finally, the affidavit does not allege that the directory sites were not provided on publicly accessible internet websites. The defense expert will testify that internet users commonly post hidden service addresses and directory sites on the public internet.[2]

---

[2] At an evidentiary hearing, the defense intends to call William Budington, a Senior Staff Technologist at the Electronic Frontier Foundation. https://www.eff.org/about/staff/william-budington.

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Moreover, "upon accessing Playpen's home site, users would need to ignore the two images of partially clothed prepubescent females with their legs spread apart—a likely preview of the illicit content on the website." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 4-5 ("[T]he homepage showed two 'partially clothed prepubescent females with their legs spread apart.'"). But here, "[a] review of the initial TARGET WEBSITE page revealed it was a message board web page that contained a search bar, and showcased two hyperlinks titled, 'Announcements' and 'Important Information.' Located below the title were hyperlinks including those entitled 'Quick Links,' 'Home,' 'Board Index,' 'Login,' and 'Register.'" Ex. 3 at 20. The Target Website's homepage was benign.

Next, "to get beyond the [Playpen] homepage, users would need to register a new account, a process which explicitly advised users to provide a false email address in order to avoid detection." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 5 ("[T]he site's homepage emphasized anonymity."). Here, by contrast, the affidavit did not allege that the target user logged into the website. Moreover, it alleges that "[u]sers were required to create an account (username and password) in order to access the majority of the material," implying some material was viewable without logging in. Ex. 3 at 24.

Finally, the Playpen targets were alleged to have repeatedly accessed specific CSAM: "the FBI found someone had registered an account with Playpen … had accessed an online posting titled 'Deep Anal (updated Mirrors)' within a section titled 'Pre-teen Videos >> Girls HC [Hardcore]' … accessed online posts in the 'Girls HC [Hardcore]' forum containing links to compilations of images depicting images of child pornography … had actively logged onto the website for a total of eighteen hours and thirteen minutes." *Vortman*, 2016 WL 7324987 at *3; *Anzalone*, 923 F.3d at 3 ("Anzalone was logged into the website for twelve hours."). Here, by contrast, the

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

affidavit alleges only that the target user "accessed the Target Website." Ex. 3 at 17. Moreover, as described above, the Target Website's homepage, unlike Playpen, contained no CSAM or material suggesting it contained CSAM.

### D.    Factors 3 and 4

As to the third factor, "the government approached the defendant initially" and fourth, "the government encouraged a defendant to participate in the charged conduct." *See Black*, 733 F.3d at 305, 306.

In the Playpen cases, the government did not "add content to the website, or even engage with Playpen users." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 923 F.3d at 6 ("The record also shows that the government did not make any improvements to the website.").

But here, the affidavit does not allege what the FLA did with the Target Website's content, and it appears the FLA left, unmodified, encouraging messages on the website: "Welcome abusers and abusees and those that enjoy watching. This website was created to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures) as well as discussion of such." Ex. 3 at 20. "The message continued, 'PS Please register to see all the forums, and use strong password for user profile.'" *Id.*

Another lengthy message encouraged further uploads: "Rules are simple all material must be related to Hurtcore content. What is Hurtcore content? It is rape, fighting, wrestling, bondage, spanking, pain, mutilation, gore, dead bodies, and etc. (no limits) Why does this place exist? There was a need and since society thinks I am worst than any abuser or creator of Hurtcore content, I decided to create this place for those who like it and want to share. Besides I am the mischievous god. It is up to you to make this the best Hurtcore board there is. *So please upload whatever you can so that it can be shared.*" *Id.* at 21 (emphasis added).

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Finally, the affidavit alleges that the "[u]sers interested … in advertising child exploitation and pornography websites they operate … use directory sites that advertise the web addresses" and that the Target Website "was listed on one or more of such directory sites," implying that the FLA continued advertising the Target Website. Ex. 3 at 25

### E.    Factor 5

As to the fifth factor, the "duration," *see Black*, 733 F.3d at 308, of the FLA's operation of the CSAM website extended from at least June 2019 (Ex. 3 at 20), and as early as April 2019 (*Id*. at 23-24), to August 2019 (*Id*. at 23) or even September 2019, which the government told counsel is the date of a document in discovery from the FLA describing files on the Target Website. Ex. 1 at 1. This is significantly longer than "the government's attachment to Playpen [that] lasted less than two weeks." *Vortman*, 2016 WL 7324987 at *5. Even that two weeks "falls close to the line." *Anzalone*, 923 F.3d at 6.

The "nature," *see Black*, 733 F.3d at 308, of the FLA's operation, and the "necessity," *see id*. at 309, of the FLA's operation to the target user's conduct, as described above, included advertisement on directory sites and encouraging user registration, participation, and uploads.

### F.    Factor 6

Finally, as to the sixth factor, the affidavit did not establish "the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. The affidavit states generally that "[d]ue to the anonymity provided by the Tor network, it can be difficult or impossible to determine, at the beginning of an investigation, where in the world a particular website or user is located." Ex. 3 at 23. However, the government cannot use obstacles to a minor investigatory step of determining a user's general location "in the world" to justify a warrantless search of an

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

IP address, which is alleged to have been a major investigatory step that revealed the target user's precise location and identity. Ex. 3 at 26.

Since all six factors weigh against the government, the Court should dismiss the indictment for outrageous government conduct.

## III.    THE COURT SHOULD SUPPRESS EVIDENCE.

### A.    Both warrants improperly relied on warrantless and unlawful searches and prejudicial misinformation.

The government initiated an investigation and subsequently obtained a warrant to search Mr. Howell's home and devices after it received a tip from a Foreign Law Enforcement (FLA) in 2019. Ex. 1 at 1. The ensuing search led to the instant Indictment charging Mr. Howell with possession of child pornography.

The FLA tip, based on IP address information, claimed that someone at Mr. Howell's physical address accessed a website homepage. The homepage was ordinary and contained no unlawful image or information. Some but not all of the website beyond the landing page was password protected and required registration to access.

The government knew that it could not obtain a search warrant based on the FLA tip that concluded someone accessed a lawful web page. Therefore, through SA Kimmel, the government applied for two search warrants. Ex. 2, 3. The affidavits accompanying the two applications were misleading constructs.

The first search warrant application sought permission to view four images that came to the government's attention after a Google tip to the National Center for Missing and Exploited Children (NCMEC) in 2013. Ex. 2 at 2-3. The government knew that it needed to obtain these images to support a subsequent warrant application to search Mr. Howell's home and digital devices.

In an attempt to view the four images from the 2013 Google tip, the first application claimed that: (1) Mr. Howell was a suspect in a 2011 child molestation

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

investigation in which charges were never filed, Ex. 2 at 7; (2) there was a separate Microsoft NCMEC tip in 2012 that was forwarded to law enforcement in Oregon, *id.*; (3) SA Kimmel conducted a warrantless search when he viewed the four images from the 2013 Google tip, but did not rely on this search to support probable cause, *id.* at 12; and (4) Mr. Howell allegedly accessed three lawful and publicly available websites, *id.* at 11-12.

These claims were misleading because, first, the 2011 investigation resulted in no arrest or charge because, as the government knew, Mr. Howell was completely innocent. At an evidentiary hearing, defense witness testimony would establish that this was a mere family dispute in which the alleged victim denied being victimized and opposed prosecution. SA Kimmel included unfounded allegations for prejudicial value.

Second, SA Kimmel included the 2012 Microsoft tip, which was unreliable and led to an unlawful and warrantless search, for similar prejudicial value. Searches without a warrant are presumptively unreasonable and the government has the burden to prove a warrantless seizure did not violate the Fourth Amendment. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

No Microsoft employee had viewed the images. Ex. 2 at 7. The private search exception does not apply here because no private party conducted a search for the government to replicate. *United States v. Jacobsen*, 466 U.S. 109 (1984); *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021) (holding that examining e-mail attachments from a CyberTip without a warrant violates the Fourth Amendment); *United States v. Lichtenberger*, 786 F.3d 478 (6th Cir. 2015).

Still, Special Agent Page K. McBeth of the Oregon Department of Justice conducted an unlawful and warrantless search when she viewed the images from the

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

2012 tip.[3] Ex. 2 at 7. The government may not rely on the independent source doctrine as an exception to the warrant requirement because "information acquired during the initial unlawful entry was presented to the Magistrate Judge and affected the Magistrate Judge's decision to issue the warrants." *United States v. Chan*, 2021 WL 1531002 at *6-7 (N.D. Cal. April 19, 2021) (citing *Murray v. United States*, 487 U.S. 533, 542 (1988), which noted that the "ultimate question" for the independent source doctrine focuses on whether "information acquired during that [initial unlawful search] was presented to the Magistrate and affected his decision to issue the warrant.").

SA Kimmel tried to absolve the government of the unlawful search by claiming that "out of an abundance of caution" he did "not rely[] on any statements from SA McBeth about her observations upon reviewing these files to establish probable cause for this application [to view the four images from the 2013 Google tip]." Ex. 2 at 7.

But if SA Kimmel did not intend for the magistrate to consider the 2012 tip and the warrantless search, he would not have included them. As stated by SA Kimmel, the affidavit "does not set forth each and every fact that I or others have learned during the course of this investigation. I have set forth only the facts that I believe are relevant to the determination of probable cause." *Id*. at 5. SA Kimmel added in the tip for prejudicial value and intended to communicate to the magistrate that SA McBeth found child pornography when she unlawfully viewed the files.

Finally, the 2012 tip was stale in 2020. *Cf. United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) ("We are unwilling to assume that collectors of child pornography keep their materials indefinitely" but finding no staleness "when the search was conducted ten months later"); *United States v. Nguyen*, 743 F. App'x 764, 766 (9th Cir.

---

[3] While SA Kimmel's first application included that the Oregon Department of Justice was initially involved in the investigation, he failed to inform the magistrate of the reason: the IP address from the 2012 Microsoft tip returned to a physical location in Portland, Oregon that had no connection to Mr. Howell. Ex. 4.

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

2018) ("[A] three month delay between the initial download and the search did not make the warrant stale.").

Third, and perhaps most problematic, is that SA Kimmel also conducted an unlawful and warrantless search of the four Google images from the 2013 tip *prior* to asking the magistrate to grant permission to view those exact same images: "Although I have already examined the SUBJECT FILES, I am seeking a warrant authorizing me to open and examine the SUBJECT FILES out of an abundance of caution. I am not relying on any information gleaned from my review of the SUBJECT FILES to bolster the showing of probable cause to support this search request." Ex. 2 at 12. Again, SA Kimmel prejudicially intended to communicate to the magistrate that he found CSAM when he unlawfully viewed the files. And like the 2012 tip, the 2013 tip was stale in 2020. *Cf. Lacy*, 119 F.3d at 746; *Nguyen*, 743 F. App'x at 766.

Fourth, obviously there is nothing illegal about visiting the public websites listed in the affidavit. Ex. 2 at 11-12.

Therefore, the first warrant should not have been issued because the information acquired during the initial unlawful search of the images was presented to the magistrate judge and affected their decision to issue the first warrant. *Murray*, 487 U.S. at 542.

Similarly, the affidavit for the second warrant also improperly relied on (1) the 2011 child molestation investigation based on false information, (2) the 2012 Microsoft CyberTip, (3) the 2013 Google CyberTip, (4) SA Kimmel's unlawful viewing of the four files associated with the 2013 Google CyberTip, (5) SA McBeth's unlawful viewing of the four files associated with the 2012 Microsoft tip, and (6) allegations that Mr. Howell visited public and lawful websites. Ex. 3 at 27-34. Among other reasons, the second warrant to search Mr. Howell's home and devices also should not have been issued because information acquired during initial unlawful searches of the images from

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

both CyberTips was presented to the magistrate judge and affected their decision to issue the second warrant.

**B.    The second search warrant improperly relied on the FLA's warrantless and unlawful search.**

**1.    The target user had a reasonable expectation of privacy.**

The use of a pen register to obtain an internet user's IP address exposed to the public does not violate a reasonable expectation of privacy. *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008). "However, unlike the facts in *Forrester*, where the individual was openly conveying his IP address to third parties by using the open internet, here, [the target user] was *not* using the open internet and his IP address was taken directly from his computer…" *Vortman*, 2016 WL 7324987, at *7; *United States v. Anzalone*, 208 F. Supp. 3d 358, 366 (D. Mass. 2016), *aff'd*, 923 F.3d 1 (1st Cir. 2019) ("[T]he defendant had a reasonable expectation of privacy in his personal computer and that the government's use of the NIT constituted a Fourth Amendment search.").

At an evidentiary hearing, the defense expert will testify that the only reliable way to determine the IP address of a Tor user is to seize the hidden service website, as was done here by the FLA, and then use the website's connection to the user to load malware onto the user's computer. This is what the government did with the NIT in the Playpen cases.

**2.    The exclusionary rule applies to the FLA's warrantless search.**

First, "the circumstances of the foreign search and seizure are so extreme that they 'shock the (judicial) conscience.'" *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978). This is true for essentially the same reasons that it is outrageous government conduct, as described above.

Second, while "[t]he Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country,"

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013) (citation omitted), here, the

2  FLA's investigation extended into the United States. The defense expert will testify, as

3  described above, that the FLA's only reliable way to determine the IP address of the

4  target user was to use the Target Website's connection to the user to load malware like

5  the NIT in the Playpen cases.

6        Third, operating the Target Website and searching the target user was a joint

7  venture between the government and the FLA. *See Rose*, 570 F.2d at 1362 ("So long as

8  [the government] was in it before the object of the search was completely

9  accomplished, [the government] must be deemed to have participated in it.") (quoting

10 *Lustig v. United States*, 338 U.S. 74, 79 (1949)). The affidavit attests that "[t]here is a

11 long history of U.S. law enforcement sharing criminal investigative information with

12 FLA and FLA sharing criminal investigative information with U.S. law enforcement,

13 across disciplines and including the investigation of crimes against children." Ex. 3 at

14 24. This is particularly true for Tor-related investigations: "U.S. as well as foreign law

15 enforcement agencies investigate anonymous offenders engaging in online child sexual

16 exploitation via Tor hidden service websites such as the website(s) described herein.

17 Those websites are globally accessible. The websites and their users may therefore be

18 located anywhere in the world. Due to the anonymity provided by the Tor network, it

19 can be difficult or impossible to determine, at the beginning of an investigation, where

20 in the world a particular website or user is located. Accordingly, when a law

21 enforcement agency obtains evidence that such a website or website user may be

22 located in another country, it is common practice for that law enforcement agency to

23 share information with a law enforcement agency in the country where the website is

24 located or the offender appears to reside, in accordance with each country's laws." *Id*. at

25 23.

26

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### C.    Accessing the Target Website's benign homepage is not probable cause to suspect possession of child pornography.

Unlike the Playpen cases, the benign nature of the Target Website's homepage and the affidavit's bare allegations about the internet user's conduct do not establish probable cause.[4]

First, in the Playpen cases, "it would be extremely unlikely for somebody to 'stumble' onto the site." *Vortman*, 2016 WL 7324987 at *8; *Anzalone*, 923 F.3d at 5. But here, as described above, the affidavit alleges that there are "directory sites" that "users utilize … to identify new web forums, chat sites, image galleries and file hosts." Ex. 3 at 25.

Second, in the Playpen cases, "the NIT would only be deployed against individuals who logged into Playpen by entering both a username and password." *Vortman*, 2016 WL 7324987 at *8; *Anzalone*, 926 F.3d at 5. Here, as described above, the affidavit alleged only that the target user accessed the benign homepage and did not register or log into the website.[5]

---

[4] The affidavit contains bare allegations about the FLA's supposed credibility, such as its "established rule of law," and primarily relies on general descriptions of its past cooperation with the government. Ex. 3 at 24-25. This is insufficient to establish a reliable tip. *Cf. United States v. Chambers*, 132 F. App'x 25, 30 (5th Cir. 2005) ("…confidential informant who the police officer avers 'has provided [the officer] with information three times in the past one month, and on each occasion the information provided by the [informant] has proven to be true reliable and correct.'"); *United States v. Hunter*, 333 F. App'x 920, 924 (6th Cir. 2009) ("…inability to provide details of past tips may have called his credibility into question…"). Moreover, the year-old tip was stale. Cf. *Lacy*, 119 F.3d at 746; *Nguyen*, 743 F. App'x at 766.

[5] The government previously stated to counsel in writing that the affidavit "does not contain any factual assertions" that the target user accessed "portions of the TARGET WEBSITE" beyond the benign homepage. The record in this case therefore concededly differs from *United States v. Sanders*, 107 F.4th 234 (4th Cir. 2024), where the court held that "a 'single click' of an Internet link will not establish probable cause to search a residence for evidence of child pornography," but the record showed "Sanders's IP address had accessed child pornography on [Target Website]." *Id.* at 250, 251 n.14.

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Third, "upon accessing Playpen's home site, users would need to ignore the two images of partially clothed prepubescent females with their legs spread apart—a likely preview of the illicit content on the website." *Vortman*, 2016 WL 7324987 at *5; *Anzalone*, 926 F.3d at 4-5. But here, as described above, "[a] review of the initial TARGET WEBSITE page revealed it was" benign. Ex. 3 at 20.

Fourth, as described above, the Playpen targets were alleged to have repeatedly accessed specific CSAM. *Vortman*, 2016 WL 7324987 at *3; *Anzalone*, 923 F.3d at 3. But here, as described above, the affidavit alleges only that the target user "accessed the Target Website." Ex. 3 at 17.

## IV.   THE COURT SHOULD HOLD A *FRANKS* HEARING.

The affiant makes repeated attestations despite knowing of contrary evidence and misstates the technology underlying Tor, each of which is "a false statement knowingly and intentionally, or with reckless disregard for the truth, [] included by the affiant in the warrant affidavit." *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

First, the affidavit attests that "[d]evices directly connected to the Internet are uniquely identified by IP addresses, which are used to route information between Internet-connected devices." Ex. 3 at 17. However, as the defense expert will testify, multiple devices can use the same IP address, especially when connected to the internet through a single router.

Second, the affidavit attests that "a Tor user necessarily (and voluntarily) shares the user's IP address with Tor network relay computers, which are called 'nodes.'" *Id.* at 18. However, as the defense expert will testify, only the first node in the chain of nodes between the user and the hidden service learns the user's IP address. Moreover, the expert will testify that the first node is a "guard node," a position that only certain reputable nodes obtain, and for a fixed and lengthy period, unlike other nodes that are randomly and frequently reassigned. Similarly, the affidavit attests that Tor's design

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 16

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

"can prevent the operator of a Tor node from observing the content (but not the routing information) of other Tor users' communications." Ex. 3 at 18. Again, as the defense expert will testify, a node operator only learns a user's routing information if they are the first node, the guard node, in the chain.

Third, the affidavit attests that "[i]n June of 2019, the computer server hosting the TARGET WEBSITE, which was located outside of the United States, was seized by a foreign law enforcement agency." *Id*. at 20. Elsewhere, however, it states that "FLA determined that on April 21, 2019, [target user's] IP address" accessed the website. *Id*. at 23-24. The defense expert will testify, as described above, that the only reliable way to determine the IP address of a Tor user is to seize the hidden service website, as was done here by the FLA, and then use the website's connection to the user to load malware onto the user's computer. This is what the government did with the NIT in the Playpen cases. Therefore, the FLA must have seized the website before determining that an IP address accessed it.

Fourth, the affidavit attests that "FLA had not interfered with, accessed, searched or seized any data from any computer in the United States in order to obtain that IP address information." *Id*. at 24. But the defense expert will testify, as described above, the only reliable way to determine the IP address of a Tor user is to load malware onto the user's computer, like the government's NIT in the Playpen cases.

Fifth, the affidavit attests that "U.S. law enforcement personnel did not participate in the investigative work through which FLA identified the IP address information provided by FLA." *Id*. But substantial material in the public record contradicts this claim. *United States v. Shacar*, No. 21-CR-30028-MHM, Dkt. 113, Ex. 15 (D. Mass. Mar. 29, 2024). Moreover, as described below, the affiant attests to his other communication, knowledge of, and involvement in the FLA and its operation that is unsupported by discovery. The public record shows, and compelled discovery will

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 17

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

show, that after the blowback to the government from its operation of Playpen and use of malware, the NIT, it turned to entities like the FLA to do the same and improperly characterized the results as independent tips.

Sixth, as described above, both affidavits rely on warrantless and unlawful searches, prejudicially include the results of those searches, and other assertions like the 2011 child molestation investigation known to be false.

## V.   THE COURT SHOULD COMPEL DISCOVERY

The government informed counsel that it produced all discovery related to the affidavits, FLA, and Target Website, but several attestations are unsupported by the current productions. The Court should compel discovery supporting these and other attestations in the affidavit.

First, the affidavit attests: "In June of 2019, the computer server hosting the Target Website, which was located outside of the United States, was seized by a foreign law enforcement agency." Ex. 3 at 20. No discovery describes this seizure.

Second, the affidavit attests that "[a]s of June 2019, the website had over 820,000 members and over 81,000 postings." *Id*. No discovery describes these statistics.

Third, the affiant "spoke with a law enforcement agent who is familiar with the efforts of law enforcement to investigate the Target Website." *Id*. at 22. No discovery describes this conversation.

Fourth, the affidavit attests that "[w]hile it operated, the web address for the website described herein was listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of children." *Id*. at 25. No discovery describes these directory sites or the Target Website's appearance on them.

COMBINED MOTION TO DISMISS, SUPPRESS, HOLD A *FRANKS* HEARING, AND COMPEL DISCOVERY (*U.S. v. Howell*, CR21-190-JCC) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## VI.  CONCLUSION

For the reasons described above, the Court should dismiss the indictment, or in the alternative, hold an evidentiary and *Franks* hearing, suppress evidence, and compel discovery.

DATED this 16th day of August 2024.

Respectfully submitted,

s/ *Gregory Geist*
s/ *Mukund Rathi*
Assistant Federal Public Defenders
Attorneys for Robert J. Howell Jr.

We certify that the forgoing contains 5656 words. A motion to file overlength brief has been filed with the Court.

COMBINED MOTION TO DISMISS, SUPPRESS,
HOLD A *FRANKS* HEARING, AND COMPEL
DISCOVERY
(*U.S. v. Howell*, CR21-190-JCC) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**