The Honorable John C. Coughenour

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

UNITED STATES OF AMERICA,

NO. CR21-190 JCC

9

Plaintiff

GOVERNMENT'S RESPONSE TO
COMBINED MOTIONS TO DIMSSS,
SUPPRESS, AND COMPEL DISCOVERY
(DKT 74)

10

v.

ROBERT J. HOWELL, JR.,

11

Defendant.

12

13

## I.    INTRODUCTION

14

In April 2019, Robert J. Howell, Jr., used the anonymous Tor network to access a

15

website (the Target Website) dedicated to child sexual abuse material (CSAM).  A

16

foreign law enforcement agency (the FLA) unmasked his IP address and then alerted U.S.

17

law enforcement of its discovery a few months later.  After identifying Howell, who had

18

been the subject of multiple child exploitation investigations in the past, HSI Special

19

Agent Matthew Kimmel applied for and obtained warrants to search Howell's person and

20

home for evidence of CSAM trafficking.  During the search, police recovered numerous

21

digital devices containing thousands of CSAM files, resulting in the instant prosecution.

22

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 1
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Howell's motions seeking to suppress evidence, dismiss the indictment, and compel

2  additional discovery are meritless and should be denied.

3      First, neither the Fourth Amendment nor its exclusionary rule apply to the actions

4  of the FLA.  The FLA reported it obtained Howell's IP address in compliance with its

5  own law as part of an independent investigation without searching a computer in the

6  United States.  And Howell's only response is baseless conjecture that the facts are

7  otherwise.   As such, there is no basis to apply the exclusionary rule.

8      Next, the warranted search of Howell's digital media complied with the Fourth

9  Amendment.  SA Kimmel's detailed affidavit established a fair probability that, at a

10  minimum, Howell intended to access CSAM via the Target Website and that a search of

11  his digital media would reveal evidence of CSAM trafficking crimes.  Howell disagrees

12  but offers no good reason to second-guess the magistrate judge's probable cause finding.

13  His request for a *Franks* hearing also fails because his conclusory assertions of bad faith

14  and failure to articulate why any supposed falsity in the affidavit was material fall far

15  short of the substantial preliminary showing necessary to warrant a hearing.  And nothing

16  else he offers warrants suppression.

17      Next, Howell's motion to dismiss lacks merit.  The outrageous government

18  conduct he alleges centers on his speculative theory that the FLA remotely searched his

19  computer.  Not only is there no evidence of a remote search, but the FLA also said it did

20  no such thing.  And since U.S. law enforcement did not participate in the investigation,

21  there would be no basis for dismissal in any event.

22

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 2
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Finally, Howell offers no basis to compel discovery under Rule 16.  Other than

2    identifying several topics about which he is curious, Howell does nothing that would

3    constitute the threshold showing of materiality that is required.

4    ## II.    FACTUAL AND PROCEDURAL BACKGROUND

5    This case involves users of the Tor network and a Tor hidden service, the Target

6    Website.  Unlike the traditional internet, the Tor network attempts to provide users

7    anonymity by masking their IP addresses.  Dkt 75, Ex. 3 at 10-49 (Res. Aff.) ¶ 9.  This

8    means that traditional methods of identifying a user's IP address are not effective.  *Id.*

9    Accessing the Tor network requires specialized software.  Res. Aff. ¶ 10.  The

10    easiest option is downloading the free "Tor browser," which is configured to connect to

11    and then route traffic through the Tor network.  *Id.*

12    Like any other internet communications, Tor network traffic is split into packets

13    containing routing information that relies on IP addresses (the header) and content (the

14    payload).  Res. Aff. ¶ 11.  Tor users must share their IP address with at least one Tor

15    relay computer (a node) to communicate through the network.  *Id.*  As the packets travel

16    through the Tor network, nodes can see the address information of the node the

17    communication came from and the node the information should be sent to.  *Id.*

18    Using Tor, someone may access traditional open-internet sites such as

19    www.justice.gov.  Res. Aff. ¶ 12.  However, since Tor routes traffic through multiple

20    nodes before reaching their destination, that website does not see the Tor user's actual IP

21    address.  *Id.*  Rather, it sees the IP address of the last relay computer (the "exit node").

22    *Id.*  Thus, it is the exit node IP address that appears on that site's IP address log.  *Id.*

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 3
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Tor network "hidden services" like the Target Website are accessible only to users operating on the Tor network. Res. Aff. ¶ 14. Like other websites, hidden services are hosted on computer servers that communicate through IP addresses. *Id.* However, hidden services have unique technical features that attempt to conceal the computer server's true IP address (and thus its location). *Id.*

Unlike standard Internet websites, hidden service addresses consist of a specific number of algorithm-generated characters followed by the suffix ".onion." Res. Aff. ¶ 15. Unlike ordinary Internet websites, there is no publicly available listing to query the IP address of a server hosting a hidden service. *Id.* So, while law enforcement agents can often view and access hidden services that are facilitating illegal activity, they generally cannot identify its IP address via open-source queries. *Id.* And as with all Tor traffic, communications between users' computers and a Tor hidden service webserver are routed through a series of intermediary computers. *Id.* Thus, neither law enforcement nor hidden-service users can use traditional means to determine the true IP address (and location) of a computer server that hosts a hidden service. *Id.*

As described in greater detail in SA Kimmel's affidavit, the Target Website was an online bulletin board dedicated to the advertising and distribution of CSAM that operated from approximately September 2016 to June 2019. Res. Aff. ¶ 16. In June 2019, a foreign law enforcement agency seized the server hosting the Target Website, which was located outside the United States. *Id.*

The Target Website had numerous posts containing images and/or videos depicting child sexual abuse and child erotica involving prepubescent males, females,

toddlers, and infants. Res. Aff. ¶ 22. Numerous posts also contained CSAM images or videos depicting extreme violence, gore, and sometimes death. *Id.*

Law enforcement agencies around the world investigate offenders using hidden services like the Target Website. Res. Aff. ¶ 24. Since they are globally accessible, these hidden services and their users may be anywhere in the world. *Id.* Thus, it is often impossible, at the outset of an investigation, to determine the location of an offender or target hidden service. *Id.* So when law enforcement in one country investigating a suspect or site locates them in another country, they will share that information with a law enforcement agency in that country. *Id.*

That is what happened here. Res. Aff. ¶ 25. In August 2019, the FLA—with a long history of providing reliable information—notified the FBI it determined that on April 21, 2019, IP address 50.34.100.94 (the Target IP) "was used to access online child sexual abuse and exploitation material" via the Target Website. *Id.*

The FLA is a national law enforcement agency in a country with an established rule of law. Res. Aff. ¶ 27. The FLA obtained the Target IP information through lawful investigative means in its jurisdiction and did not interfere with or search any computer in the United States. *Id.* ¶ 27; *see also* Dkt 75, Ex. 1. U.S. law enforcement did not participate in the FLA investigation. Res. Aff. ¶ 27.

Several key observations led SA Kimmel to conclude it was unlikely the user of the Target IP could have accessed the Target Website ignorant of its purpose: 1) the Target Website was accessible only via Tor and then only with the algorithm generated web address; 2) hidden services are not indexed to nearly the same degree as traditional

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 5
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

internet sites, meaning a traditional web search was unlikely to reveal the Target

Website's address; and 3) the Target Website was advertised on at least one Tor-based

site that listed hidden services dedicated to child exploitation and contained links to

access them. Res. Aff. ¶¶ 29-31. Given the "numerous affirmative steps" required to

access the Target Website, SA Kimmel explained, "it is extremely unlikely that any user

could simply stumble upon" the Target Website "without understanding its purpose and

content." *Id.* ¶ 31. As such, it was likely any user who accessed the Target Website did

so intending to access CSAM. *Id.* ¶ 31.

SA Kimmel then explained that at the time someone used the Target IP to connect

to the Target Website, that IP address was linked to Howell's home in Whatcom County,

Washington. Res. Aff. ¶¶ 32-35.

SA Kimmel then described   different child exploitation investigations in which

Howell was a suspect. Res. Aff. ¶¶ 36-47. The first involved a 2011 child molestation

investigation. *Id.* ¶ 36. The case was eventually closed without charges, however,

because the family stopped cooperating with the investigation. *Id.* The other two

involved Cybertip reports from Microsoft and Google to the National Center for Missing

and Exploited Children (NCMEC). Res. Aff. ¶¶ 37-47. Each provider reported that a

user of its services had uploaded suspected child sexual abuse material to its servers and

and included the suspected CSAM with its report. *Id.* SA Kimmel could not confirm

whether employees at Microsoft and Google had viewed this imagery before submitting it

to NCMEC, however. *Id.* ¶¶ 38, 43. So he did not include any information about the

content of the imagery submitted by Microsoft in his search application. *Id.* ¶ 38. SA

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 6
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Kimmel did describe the imagery submitted by Google in his affidavit, *id.* ¶ 43, but only

2  after obtaining a warrant to examine those files.  *Id.* ¶ 43; *see also* Dkt 75, Ex. 2 at 4-13

3  (CT Aff.).[1]

4      SA Kimmel then outlined additional information he gathered—including online

5  activity likely associated with Howell—that further linked Howell to the accounts

6  reported in the Cybertips and the FLA tip.  *See* Res. Aff. ¶¶ 48-54.

7      Finally, SA Kimmel explained why Howell's home and person were likely to

8  contain digital evidence or contraband.  Res. Aff. ¶¶ 58-74.  Among other things, SA

9  Kimmel noted how the internet and digital devices facilitate CSAM trafficking, the

10  tendency of offenders like Howell to retain collected CSAM for extended periods, and

11  the enduring nature of digital evidence—often recoverable even after deletion.

12      SA Kimmel presented the warrant application in August 2020, and executed the

13  warrants shortly thereafter. Agents seized numerous digital devices during the search.

14  And Forensic examination of those devices revealed 1) evidence of the use of Tor, 2)

15  thousands of CSAM files stored across multiple devices, and 3) evidence showing

16  Howell used those devices.

17      The government filed a criminal complaint against Howell in July 2021, and the

18  grand jury returned an indictment charging him with possession of CSAM in violation of

19  18 U.S.C. § 2252(a)(4)(B).   The government anticipates presenting a superseding

20

21

22  [1] SA Kimmel first viewed the Google imagery without obtaining a warrant.  However, he disclosed that fact to the magistrate judge in his application to view the Google files and expressly disclaimed any reliance on what he learned when he viewed the files initially in support of the probable cause showing.  CT Aff. ¶ 23.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 7
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  indictment in late September, which it alerted defense counsel to shortly after Howell

2  filed his motions.

3      At his initial appearance, Howell was released over the government's objection

4  and remained on bond until shortly before filing his motions.  After it came to light

5  Howell had been accessing the internet and computer equipment without authorization,

6  Magistrate Judge Peterson revoked Howell's bond.  He remains in custody pending trial,

7  currently set for November 4, 2024.

## III.    ARGUMENT

9      In his pleading, Howell offers little or even no explanation of his theory or legal

10 position on several issues.  This includes aspects of his request to suppress the FLA tip,

11 not explaining the materiality of alleged falsehoods supporting his *Franks* argument, not

12 addressing *Leon* good faith, and offering no explanation why the discovery that he seeks

13 to compel is material.  The government can only presume he is leaving these matters for

14 his reply and has done its best to anticipate his arguments and respond accordingly.

15 However, this Court need not tolerate such tactics.  *See, e.g.*, *Zamani v. Carnes*, 491 F.3d

16 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the

17 first time in a reply brief.").

## A.    The Fourth Amendment does not apply to the FLA's investigation.

19      The fruits of searches by foreign officials outside the United States are not

20 generally subject to suppression because neither the "Fourth Amendment nor the

21 judicially created exclusionary rule applies to acts of foreign officials."  *United States v.*

22 *Barona,* 56 F.3d 1087, 1091 (9th Cir. 1995).  This general rule is an expansive one, with

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 8
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

only "two very limited exceptions": first, "if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience," and, second, "if American law enforcement officials participated in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts." *United States v. LaChapelle*, 869 F.2d 488, 489-90 (9th Cir. 1989) (cleaned up). This second exception is often referred to as the joint venture doctrine. But even where that doctrine applies, "compliance with foreign law alone determines whether the search violated the Fourth Amendment." *Barona*, 56 F.3d at 1093, n.1.

Against this backdrop, the Fourth Amendment does not apply to the FLA's identification of Howell's IP address because it obtained that information in compliance with its own laws and without searching a computer in the United States. The FLA explained: the IP address data "was lawfully obtained under" warrants authorized by the laws of the FLA's jurisdiction as part of an "independent investigation." Dkt 75, Ex. 1 at 1. And "at no time was any computer or device interfered with in the United States," nor did the FLA "access, search or seize any data from any computer in the United States." *Id.* Accordingly, there is no basis to suppress the information provided by the FLA.

**1. Howell cannot avoid the general rule that suppression is unavailable for foreign searches conducted outside the United States.**

Howell does not dispute this general rule, instead asking this Court to speculate about what the FLA *could have done* to satisfy his burden of proving the Fourth Amendment applies. *See United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005)

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 9
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  (noting that the "proponent of a motion to suppress has the burden of establishing that his

2  own Fourth Amendment rights were violated").

3      But the record does not support his conjecture.  He begins by highlighting a years-

4  old FBI investigation involving Playpen, another Tor-based CSAM hidden service.

5  There, the FBI seized the site and with judicial authorization, briefly let it continue

6  operating to permit the deployment of a tool known as a Network Investigative

7  Technique (NIT) to identify users.  He then posits that the FLA must have used a similar

8  technique because, according to his proffered expert, that would have been the "only

9  reliable" means of identifying user IP addresses.  Mot. at 14.

10     Howell's theory has a few fatal flaws.

11     First, his expert does not actually know what the FLA did to identify his IP

12  address.  And of course, the FLA's statement about what it did flatly contradicts Howell's

13  theory.  The FLA said, in obtaining the Target IP, it did not search, access, or interfere

14  with any U.S.-based computer.  Dkt 75, Ex. 1 at 1.  So Howell's insistence that the FLA

15  must have searched his computer remotely lacks any factual basis.

16     Next, the FLA has a long history of providing reliable information.  Res. Aff. ¶ 25.

17  That includes information about U.S.-based targets of the current investigation who have

18  been identified and apprehended by U.S. law enforcement.  Res. Aff. ¶ 28.  Thus, when

19  Howell says a site takeover and NIT deployment is the only reliable means of unmasking

20  a Tor user's IP address, experience suggests otherwise.   And oh, by the way, Howell's

21  expert's opinion is apparently not a universal one.  *See* Exhibit 1, Declaration of SA

22  Caitlin Moynihan ¶¶ 1-9.

Nor does one even necessarily need to be a computer-savvy expert to hypothesize ways in which the FLA might have identified Howell's IP address without searching his computer. Perhaps the FLA maintained an undercover presence on the Target Website and goaded other users to share personally identifying information. Or perhaps Howell clicked on a link that took him to a non-Tor-based site that logged his true IP address. *See United States v. Bosyk*, 933 F.3d 319, 323 (4th Cir. 2019) (describing how law enforcement acquired darknet IP addresses through a file-sharing website).

Finally, who seized the Target Website and when make Howell's theory implausible. In June 2019, a foreign law enforcement agency seized the server hosting the Target Website. Res. Aff. ¶ 16. Howell assumes that agency and the FLA that unmasked his IP address are one and the same. But he is incorrect. Exhibit 1, Declaration of SA Caitlin Moynihan ¶ 10. What's more, the FLA tip concerns Howell's accessing the Target Website in April 2019, two months before the site's seizure. Since Howell does not theorize the NIT was also a time machine, it is unlikely the FLA investigation proceeded as he suggests.

**2.    Neither of the two narrow exceptions to this general rule against suppression of the fruits of foreign searches applies here.**

Howell's effort to invoke the two exceptions to the general rule barring the application of the Fourth Amendment to a foreign government's investigation also fails.

To start, Howell's claim that the FLA's investigation was so outrageous as to shock the judicial conscience finds support in neither law nor fact. This narrow exception applies only when a court's use of its "supervisory powers" to "preserve the

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 11
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

integrity of the criminal justice system" is *"absolutely necessary*." *Barona*, 56 F.3d 1091

(emphasis added). Here, however, the supposedly conscience-shocking investigation—

the FLA's site takeover and use of a NIT—exists nowhere in the record. And

considering the Ninth Circuit declined to apply this exception to foreign wiretaps

obtained in violation of foreign law, *cf. United States v. Peterson,* 812 F.2d 486, 491 (9th

Cir. 1987), it would make little sense to say that information lawfully obtained in the

FLA's jurisdiction should be excluded on such grounds.

The joint venture doctrine also does not apply since U.S. law enforcement was not

involved at all in the FLA's unmasking of Howell's IP address. The FLA itself said it

had undertaken an independent investigation. Dkt 75, Ex. 1 at 1. SA Kimmel did not

mince words either: U.S. law enforcement "did not participate in the investigative work

through which [the] FLA identified" the Target IP. Res. Aff. ¶ 27. Obviously, this is not

a case where U.S. law enforcement's "participation in the investigation [was] so

substantial that the action" should be deemed "a joint venture." *Peterson*, 812 F.2d at

490; *see also Barona*, 56 F.3d at 1092.

Not so fast, Howell says, but not because he has evidence to the contrary. Rather,

he just points to SA Kimmel's statement that the FLA and U.S. law enforcement have a

long history of sharing criminal investigative information across disciplines—including

crimes against children. Mot. at 14 (quoting Res. Aff. ¶ 27). He then highlights the

rather obvious point that Tor's global reach and anonymity often result in parallel

investigations by law enforcement agencies worldwide. *Id.* (quoting Res. Aff. ¶ 24).

And coming as a surprise to no one save for maybe Howell, those agencies may share

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 12
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  information when they locate an offender or hidden service in another country and their

2  local law permits doing so. *Id.* (quoting Res. Aff. ¶ 24).

3      Howell leaves it to his reader to work out the details of how information sharing

4  and overlapping investigative missions convert every Tor-based investigation into a joint

5  venture. But there is nothing about what he points to that would cast doubt on the

6  representations of the FLA and SA Kimmel that the identification of the Target IP was

7  the product of the FLA's independent investigation.

8      Finally, since the FLA's investigation was lawful in its jurisdiction, suppression

9  would be unwarranted even if there had been a joint venture. To be unreasonable under

10  the Fourth Amendment, the foreign search complained of as a joint venture must violate

11  foreign law. *Barona*, 56 F.3d at 1092-93. Even then, however, where U.S. law

12  enforcement's reliance on the representation that the search complied with local law is

13  objectively reasonable, good faith precludes suppression because the "exclusionary rule

14  does not function as a deterrent in cases in which the law enforcement officers acted on a

15  reasonable belief that their conduct was legal." *Id.* (internal quotation marks omitted); *see*

16  *also Peterson*, 812 F.2d 491-93.

17      Howell does not even challenge the notion that the FLA complied with its own

18  laws. Nor does he argue that reliance on the FLA's representation to that effect was other

19  than objectively reasonable. Both failures are sufficient by themselves to doom his joint

20  venture argument.

21

22

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 13
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.     The warranted search of Howell's home and person complied with the Fourth Amendment.**

Finding the Fourth Amendment's text "to be precise and clear," the Supreme Court "has interpreted [it] to require only three things":  (1) "warrants must be issued by neutral, disinterested magistrates"; (2) "those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (3) "warrants must particularly describe the things to be seized, as well as the place to be searched." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal quotation marks omitted).

The warranted search of Howell's home and person met each of these requirements.  To begin, Howell does not challenge the magistrate judge's neutrality, nor does he claim the warrants she issued were overbroad or insufficiently particular.  Finally, SA Kimmel's affidavit clearly and comprehensively set forth probable cause to believe Howell's digital media found during a search would contain evidence of CSAM trafficking.  Three facts were crucial:  1) the nature of Tor hidden services made it extremely unlikely Howell accessed the Target Website without knowing of and intending to access its content; 2) given this, to say nothing of his history of suspected involvement in child exploitation, it was likely Howell was someone with a sexualized interest in children and depictions of children; and 3) the well-documented habits of such offenders, along with the often enduring nature of digital evidence, made it likely Howell's devices would contain evidence of CSAM trafficking.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 14
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Probable cause requires a showing of neither "certainty" nor "even a

2  preponderance of the evidence." *United States v. Gourde*, 400 F.3d 1065, 1069 (9th Cir.

3  2006) (*en banc*).  It demands only a "fair probability" contraband or evidence will be

4  found.  *United states v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (internal quotation

5  marks omitted).  It is a "commonsense, practical" inquiry that looks to "the totality of the

6  circumstances, including reasonable inferences." *Id.* (internal quotation marks omitted).

7  Indeed, the only relevant question is whether SA Kimmel's affidavit provided the

8  magistrate judge a "substantial basis for determining the existence of probable cause."

9  *Illinois v. Gates*, 462 U.S. 213, 239 (1983).   And since reasonable minds may differ on

10  the question, a magistrate judge's finding of probable cause is entitled to "great

11  deference. " *United States v. Leon*, 468 U.S. 897, 914 (1984); *see also Gourde*, 440 F.3d

12  at 1069 ("We are not in a position to flyspeck the affidavit through *de novo* review.").

13    **1.    SA Kimmel's search warrant affidavit clearly and comprehensively set**
**forth probable cause to support the search of Howell's home and person.**

14    SA Kimmel's detailed affidavit easily clears the substantial-basis bar.

15    The affidavit explained that the FLA—which has a history of providing reliable

16  information—reported the Target IP accessed online child sexual abuse material on a

17  hidden service dedicated to CSAM in April 2019.  Res. Aff. ¶ 25.  It noted that the FLA

18  obtained this information through lawful means in its jurisdiction and without searching

19  or interfering with any computer located in the United States.  *Id.* ¶ 27.

20    The affidavit then outlined why it was very unlikely the Target IP user accessed

21  the Target Website by accident.  The affidavit described the process of accessing Tor and

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 15
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    the anonymity Tor seeks to provide, the fact that the Target Website was a hidden service

2    only accessible via Tor, and the site's disturbing and illicit content. Res. Aff. ¶¶ 25-31.

3    It then laid out the numerous affirmative steps necessary to access the Target Website and

4    its content since the site required users to register an account and as a hidden service, was

5    nowhere near as easily searchable on Tor as sites on the open internet. *Id.* ¶ 29. Plus, the

6    Target Website was listed on at least one Tor-based directory that aggregated CSAM

7    hidden services and provided links to access them. *Id.* ¶ 29. These facts, SA Kimmel

8    concluded, made it "extremely unlikely" someone could just stumble upon the Target

9    Website without intending to access its illicit content. *Id.* ¶¶ 30-31.

10    SA Kimmel then told the magistrate judge how he linked the Target IP to

11    Howell's residence and detailed several previous child exploitation investigations

12    involving Howell. Res. Aff. ¶¶ 32-57. He described three such investigations, though

13    none of which resulted in charges and all of which were nearly a decade old. *Id.* ¶¶ 36-

14    47. One involved Howell's alleged sexual abuse of a young relative. *Id.* ¶ 36. The

15    others concerned CSAM trafficking reported by Google and Microsoft involving user

16    accounts linked to Howell. *Id.* ¶¶ 37-47.

17    Finally, SA Kimmel explained why Howell's apparent interest in child sexual

18    abuse and CSAM, combined with the enduring nature of digital evidence, made it likely

19    devices found at his home or on his person would contain evidence of CSAM trafficking.

20    Res. Aff. ¶¶ 58-74.

21    Courts across the country agree that probable cause exists to search a home when

22    an IP address linked to that home was used to engage in online child exploitation conduct.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 16
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*See, e.g., United States v. Contreras*, 905 F.3d 853, 858 (5th Cir. 2018) ("[O]ur court, as well as others across the country, has found probable cause to search a residence based on just one or two uploads of child pornography [from the home's IP address].").[2]  The FLA's report that an IP address linked to Howell accessed CSAM on the Target Website surely supports the same conclusion.

That Howell accessed a CSAM hidden service only bolsters the conclusion that Howell did so intentionally.  Indeed, courts around the country have explained that the unique nature of such sites makes it exceedingly unlikely users access them while ignorant of their purpose and content.  *See, e.g.*, *United States v. DeFoggi*, 839 F.3d 701, 707 (8th Cir. 2016) ("Accessing [a child pornography Tor site] therefore required numerous affirmative steps by the user, making it extremely unlikely that a user would stumble upon it without knowing that its purpose was to advertise and distribute child pornography and understanding the content to be found there."); *see also United States v. Tagg*, 886 F.3d 579, 587-88 (6th Cir. 2018); *United States v. Kienast*, 907 F.3d 522, 529 (7th Cir. 2018).

In sum, SA Kimmel's affidavit linked criminal activity—at a minimum, Howell's accessing the Target Website with the intent to view CSAM, in violation of 18 U.S.C. § 2252(a)(4)(B)—to the objects of the requested search.  Nothing he says in his motion supports a contrary conclusion.

---

[2] *See also United States v. Vosburgh*, 602 F.3d 512, 526–27 (3d Cir. 2010) (finding probable cause to search based on user of an IP address's attempt to download a video purporting to be child pornography); *United States v. Richardson*, 607 F.3d 357, 361, 371 (4th Cir. 2010) (finding probable cause to search based on two emails containing child pornography from an account tied to home); *United States v. Perez*, 484 F.3d 735, 740–41 (5th Cir. 2007) (finding probable cause to search based on one-time transmission of child pornography via a webcam from an IP address).

**2.      Howell offers no sound basis for setting aside the magistrate judge's probable cause finding.**

Nothing Howell says in his half-hearted attack on the probable cause showing justifies setting aside the magistrate judge's determination.

First, Howell is wrong when he says SA Kimmel's affidavit failed to establish the reliability of the FLA's tip.  Mot. at 15 n.4.  Comparing the FLA to an informant, Howell says incorrectly that HSI had to corroborate the tip before it would be reasonable to rely on it. *Id.* "Courts have routinely recognized," however, "a distinction between information provided by an informant and that provided by a law enforcement officer or other government agency," because informants are "not presumed to be credible[.]" *United States v. Yusuf*, 461 F.3d 374, 384 (3d Cir. 2006);  *see also United States v. Benoit*, 730 F.3d 280, 285 (3d Cir. 2013) (finding that the Coast Guard reasonably relied on drug-related tip from a foreign law enforcement agency where that agency was known and was a repeat player in drug-trafficking prevention); *United States v. Hampton*, 504 F. App'x 402, 404 (6th Cir. 2012) (finding that magistrate judge could rely on unverified tip from German law enforcement that defendant's IP address was used to share child pornography in issuing warrant); *United States v. Hodge*, 354 F.3d 305, 311 n.1 (4th Cir. 2004) ("[S]tatements of other law enforcement officers are plainly reliable even without any special showing.") (internal quotation marks omitted));

Regardless, SA Kimmel explained that the FLA had a history of providing reliable information and had already provided tips about other IP addresses associated with accessing child exploitation content on Tor that led to the discovery and arrest of

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 18
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   offenders in the United States.  Res. Aff. ¶¶ 27-28.  With this as background, there was

2   ample reason to believe that the tip was reliable and meant what it plainly said: someone

3   used the Target IP to access online child sexual abuse material on Tor.

4       Next, Howell errs, Mot. at 15 & n.5, saying SA Kimmel's affidavit "alleged only

5   that the target user accessed a "benign" homepage and did not register or log into the

6   website."  In fact, SA Kimmel said, in August 2019, the FLA reported to U.S. law

7   enforcement that "IP address 50.34.100.94 'was used to access online child sexual abuse

8   and exploitation material' via a website that the FLA named and described as the

9   TARGET WEBSITE."  Res. Aff. ¶ 25.  He continued, the "FLA described the website as

10  having 'an explicit focus on the facilitation of sharing child abuse material (images, links

11  and videos), emphasis on BDSM, hurtcore, gore and death-related material including that

12  of children,' stated that '[u]sers were required to create an account (username and

13  password) in order to access the majority of the material,'" and provided additional

14  documentation about the Target Website, which the FLA identified by name.  *Id.* ¶ 26.

15      Howell's supports his argument with his apparent misunderstanding of the

16  government's response to one of his discovery requests.  Mot. at 15 n.5.  The relevant

17  discovery response, in its entirety from the government's March 3, 2024, letter reads:

18      **Clarification regarding Bates 760:** You are seeking clarification about the
    statement in this document that a specific IP address was used to "access

19  online child sexual abuse and exploitation material." Specifically, you are
    requesting information about whether the FLA captured only accesses to

20  the landing page for the TARGET WEBSITE described in SA Kimmel's
    search warrant affidavit or whether the FLA also obtained information

21  about user activity and access to specific content on the TARGET
    WEBSITE.

22

SA Kimmel's residential search warrant affidavit states only that, based on information provided by the FLA, a computer at an IP address later tied to the defendant's residence accessed the TARGET WEBSITE in April 2019. The affidavit does not contain any factual assertions about what portions of the TARGET WEBSITE the user at this IP Address may have accessed, if any.

Accordingly, whether the FLA has additional information about areas of the TARGET WEBSITE visited by the user of a computer at this IP address is immaterial to an evaluation of the validity of the search of the defendant's home. Moreover, the information provided by the FLA is as stated in Bates 759-62. The additional detail you have requested was not provided by the FLA. As such, I am not aware of whether the FLA has additional information concerning the defendant's access to specific portions of the TARGET WEBSITE or content located on it.

The government's response explained its position that discovery related to the user's activity on the Target Website in the FLA's possession, if any, was not relevant. And even if it were, the government had no information to disclose.

SA Kimmel's affidavit speaks for itself and said clearly: the FLA reported the Target IP accessed child exploitation material through a website dedicated to that material.  Res. Aff. ¶ 25.  Whatever Howell may believe the government meant, that does not change what SA Kimmel said, which was a verbatim recitation of the information provided by the FLA and made no mention of Howell accessing only the Target Website's homepage.

Even if there were no evidence Howell accessed CSAM on the Target Website (and again, the FLA said otherwise), nothing would change.  As detailed above, the critical facts here are that there was strong evidence showing Howell accessed a CSAM

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 20
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   hidden service that, by its nature, was not a site he likely would have stumbled upon

2   without knowing what it was and intending to access its content.

3        Finally, Howell's undeveloped staleness argument also fails.  For starters, he

4   devotes only a single sentence to that argument that he buries in a footnote.  Mot. at 15

5   n.4.  Regardless, "[i]nformation underlying a warrant is not stale if there is sufficient

6   basis to believe, based on a continuing pattern or other good reasons, that the items to be

7   seized are still on the premises."  *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir.

8   2013) (internal quotation marks omitted).  The affiant in *Schesso* "explained that

9   individuals who possess, distribute, or trade in child pornography 'rarely, if ever, dispose

10  of sexually explicit images of children' because these images are treated as 'prized

11  possessions.'"  *Id.*  Accordingly, there was ample reason to believe, given the nature of

12  the crime and the evidence sought, that such evidence would still be there "a *mere* 20

13  months after" the incident giving rise to the investigation.  *Id.* (emphasis added).  Other

14  courts have reached similar conclusions in CSAM cases.  *See, e.g.*, *United States v. Allen*,

15  625 F.3d 830, 842-43 (5th Cir. 2010) (eighteen-month delay); *United States v. Morales–*

16  *Aldahondo*, 524 F.3d 115, 117-19 (1st Cir. 2008) (three-year delay).[3]

17       As in *Schesso*, SA Kimmel's affidavit, Res. Aff. ¶¶ 58-74, explained why the

18  enduring nature of digital evidence combined with known habits of people who, like

19

20  ───────────────────────

21  [3] What's more, multiple courts considering nearly identical tips have concluded that the warrants were not stale.
    *United States v. Stuart*, 21-CR-87-LJV-JJM, 2022 WL 1055151, at *4-5 (W.D.N.Y. April 7, 2022) (rejecting
    challenge to 17-month gap); *United States v. Bateman*, 1:20-cr-10012-IT, 2022 WL 980075, at *4 (D. Mass. March

22  31, 2022) (rejecting challenge to seven-month gap); *United States v. White*, 3:21-cr-155-DJH, 2022 WL 711130, at
    *4-5 (W.D. Ky. March 9, 2022) (rejecting challenge to 22-month gap);

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 21
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Howell, engage with CSAM, made it likely his devices would contain evidence of CSAM

2  trafficking just over a year after the FLA tip.  Howell's staleness challenge thus falls flat..

3     **3.     Howell has made no substantial preliminary showing of an intentional or reckless material falsehood to justify a *Franks* hearing.**

4

5     To be entitled to a *Franks* hearing, "the defendant must make a *non-conclusory*

6  and *substantial preliminary* showing that the affidavit contained actual falsity and that the

7  falsity either was deliberate or resulted from reckless disregard for the truth."  *United*

8  *States v. Prime*, 431 F.3d 1147, 1150 n.1 (9th Cir. 2005) (internal quotations omitted and

9  emphases added); *see also United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995)

10 (extending the analysis to false inclusions or omissions).  The alleged falsity must also be

11 material.  *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).  That is, a

12 defendant must show that the affidavit, purged of its defects, would be insufficient to

13 support a finding of probable cause.  *Meling*, 47 F.3d at 1553; *see also United States v.*

14 *Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000).  "[T]he pivotal question is whether an

15 affidavit containing the omitted material would have provided a basis for a finding of

16 probable cause." *Chavez-Miranda*, 306 F.3d at 979.

17    The Supreme Court has stressed that there is a presumption of validity attached to

18 a search warrant affidavit.  *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978).

19 Defendants must offer allegations of intentional or reckless falsehood accompanied by an

20 offer of proof.  Affidavits and sworn or otherwise reliable statements of witnesses should

21 be furnished or their absence satisfactorily explained before a hearing is granted.  *See id*.

22 at 171.  Critically, allegations of negligence or innocent mistake are insufficient.  *Id.*

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 22
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

From the beginning, the Supreme Court has been "careful . . . to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith.  It crafted, therefore, a rule of very limited scope." *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982).

Yet a hearing into SA Kimmel's veracity based on bare allegations of bad faith is exactly what Howell invites this Court to undertake.  It should decline.

> i.    Information about the three earlier child exploitation investigations involving Howell was neither material nor misleading.

Howell's arguments about SA Kimmel's description of the three child exploitation investigations in which Howell was a suspect lack merit.  They rely on baseless conclusions and a specious claim of bad faith on the part of a federal agent (and by implication, a magistrate judge)

To begin, Howell fails to show this information was material.  It was relevant to be sure, but by no means a necessary part of the probable cause showing.  Were the Court to excise SA Kimmel's discussion about these earlier investigations, the bottom-line conclusion would be the same.  The FLA reported an IP address tied to Howell accessed CSAM on a Tor hidden service devoted to such material; he likely did so with culpable knowledge and intent; and given what is known about such offenders and digital evidence, a search of his home just over a year later would likely yield evidence of CSAM trafficking.  The government's point here is not that the Court should excise this information, just that its obvious immateriality dooms Howell's *Franks* challenge.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 23
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Nor did SA Kimmel mislead the magistrate judge when he described these

2   investigations in any event.

3   **2011 Child Molestation Investigation (Res. Aff. ¶ 36; CT Aff. ¶ 9.).**   Nothing

4   SA Kimmel said about this investigation in either warrant application was inaccurate.  He

5   told the reviewing judge that a young relative of Howell's reported to her mother that

6   Howell touched her inappropriately and threatened her to keep her from saying anything.

7   Her mother alerted authorities, and the Bellingham Police Department opened an

8   investigation, scheduling a child forensic interview for the victim.  Ultimately, however,

9   no charges were filed because the victim's mother declined to cooperate with the

10  investigation and did not bring her daughter to the scheduled interview.

11  Seeing conspiracy afoot, Howell claims without evidence that SA Kimmel knew

12  no charges were filed because Howell was "completely innocent," a fact he omitted from

13  his affidavits. Mot. at 10.  What SA Kimmel *knew* was what he read in the Bellingham

14  Police Department reports about the investigation, which contain no indication that

15  Howell was "completely innocent."  Howell has the same reports, so presumably if they

16  did, he would be able to point that out.

17  Howell does claim his family will establish his innocence at an evidentiary

18  hearing.  The problem with that is SA Kimmel did not speak with Howell's family about

19  this incident until after the completion of the searches Howell challenges.  And not for

20  nothing, SA Kimmel's interviews of these witnesses, particularly the victim's mother[4],

21  ───────────────

22  [4] SA Kimmel and a Bellingham Police Department detective first spoke with the victim's mother in October 2020. The detective's report of this interview may be the genesis of Howell's claim that SA Kimmel knew he was

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 24
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

have been far from the ringing endorsement of Howell's innocence Howell claims will

manifest at the hearing.  Regardless, SA Kimmel obviously could not have misled the

magistrate judge about something he was not aware of at the time.

**Google and Microsoft Cybertips (Res. Aff. ¶¶ 37-47; CT Aff. ¶¶ 10-19, 23).**

SA Kimmel's description of these investigations was also entirely accurate.

Regarding the Microsoft Cybertip, SA Kimmel explained that in 2012, Microsoft

reported to NCMEC that one of its users—ultimately linked to Howell—uploaded CSAM

to its servers.  Res. Aff. ¶¶ 37-39; CT Aff. 10-12.  Microsoft provided the suspected

CSAM, which a government agent reviewed.  Res. Aff. ¶ 38; CT Aff. ¶ 11.  SA Kimmel

could not ultimately confirm whether an employee at Microsoft had viewed the imagery

before submitting them to NCMEC, so he expressly disclaimed any reliance on what that

officer reported seeing when viewing the images.  Res. Aff. ¶ 38; CT Aff. ¶ 11.

Similarly, in 2013, Google reported to NCMEC a user—also linked to Howell—

had uploaded suspected CSAM to its servers.  Res. Aff. ¶¶ 40-47; CT Aff. ¶¶ 13-19. SA

Kimmel was able to obtain the original evidence from the Google investigation, including

the four files of suspected CSAM submitted by Google.  Res. Aff. ¶ 41; CT Aff. ¶ 14. SA

Kimmel reviewed these files without a warrant initially but being unable to determine

whether a Google employee had reviewed them before submitting to NCMEC, sought a

warrant after the fact.  Res. Aff. ¶ 43; CT Aff. ¶ 23. In doing so, he told the magistrate

---

"absolutely innocent" of this offense.  Critically, the interview occurred long after SA Kimmel prepared and submitted his affidavits, meaning he could not have concealed it from the magistrate judge.  And this was one of several contacts he has had with the victim's mother.  Her position on Howell's "innocence" has been inconsistent to say the least.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 25
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  judge that he already viewed the imagery but was not relying on information he gleaned

2  from that review to support his application. CT Aff. ¶ 23.

3      Howell's complaint about SA Kimmel's discussion of these investigations is

4  meritless. He does not dispute that SA Kimmel expressly disclaimed reliance on the

5  information gathered by the warrantless inspection of this imagery. But with a

6  shockingly straight face, he says "SA Kimmel added in the [Microsoft] tip for prejudicial

7  value and intended to communicate to the magistrate that [the officer] found child

8  pornography." Mot. at 11. He makes the same outlandish claim about the Google tip.

9  Mot. at 12 (SA Kimmel "prejudicially intended to communicate to the magistrate that he

10  found CSAM.")

11      Howell's argument fails because it depends on two equally implausible (and

12  baseless) propositions. First, this Court must believe that SA Kimmel swore under oath

13  that he did not intend to rely on the results of two different searches to support his search

14  applications. Yet his real (and secret) ask was that the magistrate judge ignore those

15  words and draw a favorable inference about the evidence he expressly disclaimed

16  reliance upon. Second, the Court would have to believe that the magistrate judge both

17  saw past SA Kimmel's verbal subterfuge and then joined him in an obvious impropriety.

18      Perhaps Howell believes what he says or perhaps he is grasping for straws in the

19  absence of evidence. Regardless, *Franks* demands something more than far-fetched and

20  unsupported conspiracy theories.

21

22

ii.    Nothing else Howell says in his motion warrants a *Franks* hearing.

The remainder of the so-called falsehoods in SA Kimmel's affidavit also do not warrant a *Franks* hearing.

Howell's unsupported speculation about what the FLA did to obtain his IP address is just that. It is certainly not evidence that SA Kimmel provided false information to the magistrate judge. As detailed above, Howell believes he was the target of a very specific investigative technique—the FLA's takeover of the Target Website and deployment of a NIT to search his computer. Several facts in the record make this theory implausible of course. But the real death blow comes from what the FLA said it did to uncover Howell's IP address—conducted a lawful investigation in its home jurisdiction without searching any computer in the United States.

Even if Howell had actual evidence that the FLA's representations about its investigation were false, he certainly offers no evidence that SA Kimmel was aware or should have been aware of any falsity. Indeed, SA Kimmel reported to the magistrate judge almost verbatim what the FLA reported, and Howell points to nothing that would have indicated to SA Kimmel there was reason to question the FLA's veracity. SA Kimmel thus could not have misled the magistrate judge by concealing information that he neither knew nor had reason to know.

The same holds true for Howell's suggestion that SA Kimmel misled the magistrate judge when he said U.S. law enforcement did not participate in the FLA investigation that identified the Target IP. Howell points to a largely redacted FOIA

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 27
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  response filed in another case and proclaims, "substantial material in the public record

2  contradicts this claim." Mot. at 17. Despite this bold claim, Howell offers no hint about

3  where in this document one might find the smoking gun that will put SA Kimmel to the

4  lie. Perhaps that's because—as is apparent from even a cursory review—no such

5  smoking gun exists? In any event, Howell also offers no evidence that would suggest SA

6  Kimmel was or should have been aware of the information in this heavily redacted

7  document. So again, it is unclear how he could have misled the magistrate judge about

8  something he did not know.

9      Finally, Howell's grousing about SA Kimmel's description of the operation of Tor

10  gets him nowhere. For starters, that Howell or his expert would have drafted the affidavit

11  differently is irrelevant. It is certainly not evidence of falsity.    And indeed, even if

12  Howell were correct that SA Kimmel failed to perfectly describe Tor, he makes no effort

13  to explain why these errors are material—let alone the product of reckless or intentional

14  disregard for the truth.   The clarifications he offers have nothing to do with the bottom-

15  line conclusion that a computer at an IP address associated with Howell accessed CSAM

16  via the Target Website and likely did so intentionally. Presumably Howell believes these

17  clarifications somehow bolster his FLA-used-a-NIT fantasy. But again, Howell has no

18  evidence that is what happened.

19      At bottom, Howell's *Franks* argument amounts to little more than a list of gripes

20  and conclusory allegations of falsity and bad faith. Such bare bones claims are not the

21  substantial preliminary showing required to warrant a *Franks* hearing, and this Court

22  should deny Howell's request.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 28
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**4.      Leon precludes suppression because SA Kimmel's reliance on the facially valid warrants was objectively reasonable.**

Even if Howell could show the warrant authorizing the search of his home and person violated the Fourth Amendment, the good-faith exception precludes suppression. *See United States v. Leon*, 468 U.S. 897, 923 n.23 (1984) ("[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."); *see id.* at 900.  It was objectively reasonable for SA Kimmel to rely on the magistrate judge's search authorization, and Howell does not say otherwise or even address *Leon's* good faith doctrine.

Ordinarily, "a warrant issued by a magistrate [judge] . . . suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id*. at 922 (quotation marks omitted).  To establish reasonable reliance on a search warrant, the warrant must present a colorable argument for probable cause.  *United States v. Krupa*, 658 F.3d 1174, 1179 (9th Cir. 2011).  "When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Leon*, 468 U.S. at 924.

*Leon*'s good-faith exception applies in all but four narrow circumstances: (1) when the warrant is "so facially deficient" that no executing officer could reasonably presume it to be valid; (2) when the warrant results from recklessly or knowingly misleading the issuing judge; (3) when the affidavit supporting the warrant is "bare bones"; and (4) when the issuing judge "wholly abandons his or her judicial role." *Id.* at 923.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 29
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

None of those exceptions to *Leon* apply here.  The warrant affidavit contained no knowing or reckless material falsehoods.  There is nothing to suggest the issuing judge was anything other than neutral and disinterested or otherwise abandoned her judicial role.  The warrants that issued clearly described the locations to be searched and the items to be seized.  And SA Kimmel's affidavit made a strong, comprehensive showing of probable cause to justify the object and scope of the search.  Once the judge signed the warrant, it was objectively reasonable for the police to rely upon it.  *Massachusetts v. Sheppard*, 468 U.S. 981, 989–90 (1984) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested").  Thus, the good-faith exception precludes suppression here.

**C.      Howell's other complaints about the Cybertip information SA Kimmel included in his affidavits lack merit.**

None of Howell's remaining complaints about the Cybertip information SA Kimmel included in his affidavits warrant suppression.

**1.      The Cybertip information was reliable and obviously relevant to the determination of probable cause.**

First, Howell says both Cybertips were unreliable but offers no hint as to why.  That is unsurprising since even a cursory review of SA Kimmel's two affidavits shows that he gathered considerable evidence linking Howell to the activity reported by the providers.  CT Aff. ¶¶ 10-23; Res. Aff. ¶¶ 37-57.  This included both reports of investigating officers and online activity linked to Howell that showed the user accounts reported by Google and Microsoft both had obvious links to Howell.  Saying otherwise

1  does not make true, and SA Kimmel's affidavits provided ample evidence showing the

2  reliability and relevance of these investigations.

3      Next are Howell's gripes about staleness, which are also easily dismissed. Had

4  SA Kimmel sought a warrant for Howell's digital media based on the Google and

5  Microsoft reports alone, there might be something to a staleness objection. That is not

6  the case here. Dated as they may be, they were helpful and relevant to establishing

7  probable cause. There was ample reason to doubt that Howell accessed the Target

8  Website by accident or without knowing what it was even without including these

9  investigations. But their inclusion certainly made an already highly improbable innocent-

10  browser scenario even less probable.

11      **2.      For two independent reasons, any constitutional error in SA Kimmel's warrantless viewing of the Google Cybertip images does not require suppression.**

12      Any constitutional violation resulting from SA Kimmel's initial warrantless

13  viewing of the Google Cybertip imagery[5] does not require suppression for two

14  independent reasons.

15      First, *Leon* good faith precludes suppression since a reasonably well-trained

16  officer in SA Kimmel's position would not have believed a warrant was required to view

17  the Google imagery. Howell points to *United States v. Wilson*, 13 F.4th 961 (9th Cir.

18  2021), for the proposition that a warrant was required to view this imagery. That

19

20

_____

21  [5] Howell argues the information obtained through the warrantless viewing of the imagery submitted by Microsoft as part of its CyberTip should also be suppressed. But SA Kimmel expressly disavowed any reliance on the descriptions provided by the Oregon law enforcement officer in his search applications. Res. Aff. ¶ 38; CT Aff.

22  ¶ 11. Accordingly, there is no information to suppress.

1  decision, however, came down more than a year after SA Kimmel's warrantless viewing

2  and the presentation of a belt-and-suspenders warrant to view that imagery.

3      *Wilson* is itself evidence of the unsettled nature of the law of private searches and

4  when, if ever, police must obtain warrants to view Cybertip content at that time.

5  Suppression would have little deterrent value in such a case. *United States v. Lustig*, 830

6  F.3d 1075, 1082 (9th Cir. 2016) is instructive.  There, the Ninth Circuit applied good

7  faith to save the warrantless search of the defendant's cellphone conducted before *Riley v.*

8  *California*, 573 U.S. 373 (2014).  The Court explained that if "precedent had to constitute

9  a factual match with the circumstances of the search in question for the good-faith

10 exception to apply, it would make the good-faith exception a nullity because the

11 exception would only apply when the search was necessarily constitutional under existing

12 precedent." *Lustig*, 830 F.3d at 1082. "We decline to impose on law enforcement an

13 obligation to constantly search for non-binding authority across all jurisdictions and to

14 curtail their otherwise authorized activities as soon as any court casts existing precedent

15 into doubt." *Id.* at 1083.

16      Second, bedrock Fourth Amendment principles preclude suppression where, as

17 here, the supposed unlawful search did not result in any actual deprivation of the

18 constitutional protection at issue.  That is, Howell maintains SA Kimmel should never

19 have been able to rely on the imagery in question without first obtaining a warrant.  And

20 while SA Kimmel did view those images without a warrant initially, he obtained a

21 warrant before relying on any information he gleaned to support his request to search

22

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 32
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Howell's home.  Thus, any taint caused by the warrantless viewing was cured by SA

2  Kimmel's seeking the very warrant Howell says the Fourth Amendment demanded.

3       The attenuation doctrine thus precludes suppression of SA Kimmel's descriptions

4  of the Google imagery.[6]  The Supreme Court has explained that under this doctrine,

5  "[e]vidence is admissible when the connection between unconstitutional police conduct

6  and the evidence is remote or has been interrupted by some intervening circumstance, so

7  that the interest protected by the constitutional guarantee that has been violated would not

8  be served by suppression of the evidence obtained."  *Utah v. Strieff*, 579 U.S. 232, 238

9  (2016) (internal quotation marks omitted).

10       Three factors guide the analysis.  (1) the "temporal" link between the violation and

11  the discovery; (2) "the presence of intervening circumstances;" and (3) of "particular[]"

12  significance, "the purpose and flagrancy of the official misconduct."  *Id.* at 239.

13       Here, the first favors suppression, the others strongly do not.  SA Kimmel's

14  warrantless viewing immediately preceded his discovery of the CSAM files, but

15  intervening circumstances broke the causal chain that would have allowed the warrantless

16  search to deprive Howell of any constitutional rights to which he was entitled.

17  Specifically, SA Kimmel applied for a warrant.  He was transparent with the magistrate

18  judge about what had happened and expressly disclaimed any reliance on what he saw,

19

20

21

22

---

[6] The government will assume for purposes of its attenuation argument that SA Kimmel needed a warrant to view the Google imagery.  It does not intend this to constitute a concession that *Wilson* was correctly decided or that a warrant was in fact required.  The issues involved are complex, and the record necessary to address them often requires significant resources to compile.  The government does not believe this case warrants such an expenditure of resources because even if Howell were to prevail on this point, he would not be entitled to suppression of the evidence from the search of his home and person.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 33
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  CT Aff. ¶ 23, thereby permitting the magistrate judge to undertake the identical inquiry

2  that would have been undertaken had SA Kimmel not viewed the imagery first.  Howell

3  thus suffered no actual deprivation of the Fourth Amendment right he insists he had.

4  And given that the law was obviously unsettled at the time, SA Kimmel's error—if any—

5  was surely neither flagrant nor purposeful.

6        Simply put, suppressing these image descriptions would punish a supposed

7  constitutional violation.  But that violation did not result in the deprivation of any

8  constitutional protection Howell says the Fourth Amendment provides.  Accordingly,

9  suppression would serve no deterrent purpose and is unwarranted here.

10       **3.     Suppression of the Google image descriptions would not materially
      change the probable cause analysis for the search of Howell's home in any event.**

11

12       Even assuming the Court believes the information gleaned by SA Kimmel during

13 his initial viewing of the Google Cybertip imagery must be suppressed, the warrants to

14 search Howell's home and person would still be valid.  The remedy for such a finding

15 would be to excise the image descriptions (and only the image descriptions) from SA

16 Kimmel's affidavit and conduct a de novo review of the probable cause showing.

17       As noted above, the combination of the FLA tip, the likelihood that Howell could

18 not have accessed the Target Website accidentally, the enduring nature of digital

19 evidence, and known habits of CSAM offenders like Howell formed the core of the

20 probable cause showing.  The information about the prior investigations was helpful and

21 relevant to be sure, but it was by no means essential to the magistrate judge's

22 determination.  Probable cause would still exist were all this information excised, so it

1  would surely still exist if only a portion of that information—the Google Cybertip image

2  descriptions—were.

3  **D.      Howell is not entitled to dismissal of the indictment.**

4          Howell's dismissal argument is fundamentally flawed because it depends entirely

5  on his FLA-used-a-NIT theory that has no support in the record.

6          The FLA said it did not search his computer.  Howell insists it must have and then

7  goes on at length about how much more outrageous the FLA's investigation was than the

8  FBI investigation in Playpen.  But since there is no evidence the FLA searched his

9  computer, it necessarily could not have undertaken the type of investigation he claims

10  was so outrageous.  And even if the FLA did use a NIT-like technique to identify his IP

11  address—and lie about it—Howell has offered no evidence to show that the United States

12  would have been aware of that nor any precedent supporting his position that the FLA's

13  purported conduct can be imputed to the government.  *Cf. United States v. Jernigan*, 111

14  F.3d 139, at *1 (9th Cir. 1997) (unpublished) (rejecting defendant's request to impute the

15  knowledge and behavior of an informant on the government).

16          Nearly all the factors that led reviewing courts to find dismissal for outrageous

17  government conduct unwarranted in the Playpen cases would apply had the FLA used a

18  similar technique at the direction or with the substantial involvement of the United States.

19  The problem is that the investigation Howell wants the government to defend exists only

20  in his mind.  The government fundamentally disagrees with Howell's analysis of the

21  factors and his factual assertions.  But it cannot offer a meaningful response to something

22  that Howell can only imagine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**E.      Howell's motion to compel discovery should be denied.**

Under Rule 16, a criminal defendant has a right to inspect documents, data, or tangible items within the government's "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).  Evidence is "material" under Rule 16 only if it is helpful to the development of a possible defense.  *United States v. Olano*, 62 F.3d 1180, 1203 (9th Cir. 1995).  "[I]n the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996).

To compel discovery under Rule 16(a)(1)(E), however, a defendant must make a "'threshold showing of materiality.'" *United States v. Budziak*, 697 F.3d 1105, 1111 (quoting *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir.1995)).  Conclusory allegations of materiality will not suffice.  A "defendant must present *facts* which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) (emphasis added); *see also Budziak*, 697 F.3d at 1111 (same).  Indeed, "ordering production by the government without any preliminary showing of materiality is inconsistent with Rule 16" and for a Court to compel discovery "[w]ithout a factual showing" of materiality is an abuse of discretion.  *Mandel*, 914 F.2d at 1219.

One threshold matter: Howell says the government "informed counsel that it produced *all* discovery related to the affidavits, FLA, and Target Website."  Mot. at 18 (emphasis added).  The government has not purported to produce "all" discovery related to these topics.   Its position has been and remains that it has complied with its criminal

1    discovery obligations and will continue to provide discovery within the possession,

2    custody, or control of a member of the prosecution consistent with those legal

3    obligations.

4          Howell makes no effort to explain why the information he seeks is material and

5    certainly cannot meet his burden to establish a threshold showing of materiality.  Indeed,

6    he simply lists several factual assertions in SA Kimmel's affidavit and observes that the

7    government provided no supporting documentation for those assertions.[7]  Mot. at 18.

8          Howell leaves the Court to guess what possible relevance the requested discovery

9    might have to his defense.  It certainly has nothing to do with a defense at trial.  Howell is

10    not charged with crimes based on his activity on the Target Website; the evidence the

11    government will present at trial is what it gathered from his devices.  Presumably, he

12    believes it would somehow bear on the issues he raised in his motion, perhaps because he

13    doubts the veracity of these statements in the affidavit.  Doubtful as he may be, he is not

14    entitled to discovery simply to check an affiant's work.

15          The requested discovery all relates to statements about the Target Website, none

16    of which Howell argues were inaccurate.   Nor, even if they were, is there any indication

17    that SA Kimmel would have known this to be the case.

18

19

20    [7] Howell points to four assertions in SA Kimmel's affidavit, only one of which (the third) was ever even the subject of a defense discovery request.  Before filing his motion, Howell's attorney emailed government counsel, confirming any meet-and-confer requirement had been met and identifying several paragraphs within the residential search warrant affidavit for which Howell would be moving to compel discovery.  Government counsel responded that he was not aware of any discovery requests to which the government had not responded.  The paragraph references in defense counsel's initial email appear to encompass the topics outlined in Howell's motion.  But with the exception of the request about SA Kimmel's conversation with another agent about the Target Website, Howell's motion is the first time the government has seen the substance of these discovery demands.

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 37
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Howell must do more to compel discovery than identify a few topics about which

2   he is curious.  Accordingly, the Court should deny his discovery requests.

3                              **IV.    CONCLUSION**

4        For the foregoing reasons, the Court should find that Howell has made no showing

5   that would justify an evidentiary hearing and deny his motions in their entirety based on

6   the pleadings.

7        DATED this 13th day of September, 2024.

8                                        Respectfully submitted,

9                                        TESSA M. GORMAN
                                         United States Attorney
10
                                         *s/ Matthew P. Hampton*
11                                       MATTHEW P. HAMPTON
                                         Assistant United States Attorney
12                                       700 Stewart Street, Suite 5220
                                         Seattle, WA 98101-1271
13                                       Telephone:   (206) 553-6677
                                         Fax:           (206) 553-0882
14                                       E-mail:Matthew.Hampton@usdoj.gov

15                                       I hereby certify that this pleading contains
                                         10,391 words, in compliance with the Local
16                                       Criminal Rules.

17

18

19

20

21

22

GOVERNMENT'S RESPONSE TO COMBINED MOTIONS - 38
*United States v. Howell*, CR21-190 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970